The next case will be 081585, Longdell Corporation Bank. This is a case of Longdell Corporation Bank and Longdell Corporation Bank. Good morning. My name is Ray Weber. I'm here on behalf of Appellant Wayne Dalton. To give you a little bit of a flavor as to what this case is about, I'd like to show the court a few exemplary blowups of evidence in this case. We've provided 8 1⁄2 by 11s, unfortunately, which weren't necessarily real clear to the court for the courts to review. This case deals with garage... Before we go too far, you've marked all of these exhibits confidential. You realize this is an open courtroom and you're showing us exhibits that you've submitted with... I mean, people over-designate confidential quite a bit to us, but I want to understand exactly what you mean by this because you're presenting them now in gigantic forms. And I appreciate that, Your Honor, and I had discussed that with opposing counsel and we've agreed to go forward in this manner. And I also agree that confidential is oftentimes overused. Not in this case. But not in this case. I'm just concerned that there are many designations of confidential in this case which have no justification for their... They're not business confidential information. It's testimony from the case. I don't understand the basis for this. Well, these are two very competitive companies, Your Honor, in a field that addressed the issue. Pinch resistance in garage doors was a very hot item. The Consumer Product Safety Commission got that going with my client, Wayne Dalton, who came up with the concept and first introduced the concept into the industry. So I do apologize to the court to the extent that it was overused by either side. So our company is already famous for not keeping its word that's confidential. Excuse me, Your Honor? I'm sorry. It's on page 11 of your brief. Our company is already famous for not keeping its word that's confidential. And again, Your Honor, many of the Well, some of the information probably should have been, but instead of separating it out surgically, it was addressed more wholesale. And that's what you're supposed to do. It's supposed to be public briefs available to everyone. I appreciate that, Your Honor. So what you're saying now is that it's not confidential? It is not, and I agreed basically to show it in this direction to the court rather than back to the observers here in the courtroom. That's what I agreed to. AMR made that request of me that I only publish these to the court. What's the matter with showing them to the audience? I mean, you're standing here in public proceeding. You're saying that only we can look at these? No, you would need to ask AMR that. I did that at their request, Your Honor. They requested, when I said these are the ones that I want to use in court, they said, well, that's okay, Ray, as long as you direct it to the court and don't bandaid about the courtroom. I'm happy to show you. What's confidential about this? It's a picture of a garage below with somebody painting. Well, there are other ones here, Your Honor. There are other ones here that are from the line review with Lowe's, which even my client today, my client didn't even know anything about the line review with Lowe's until this lawsuit commenced, and now only knows just very small smatterings from mediation and things of that nature about the presentation to Lowe's. I don't want to drag you too far down with this, but the problem is we have to write opinions. You'd like an opinion from us, and maybe this picture would be very helpful to me, but you've designated everything in here confidential, so how am I to know which ones I could include in an opinion and which ones I couldn't because I have to respect your decision on confidentiality? It just makes it very difficult. I genuinely, and I mean this, I genuinely appreciate what you're saying, and I apologize for the frustration. You're not going to apologize for the frustration, you're going to apologize for marking stuff confidential, which has no business being marked confidential. You should be apologizing. And I do that as well. I do that as well, but these are, AMAR requested these to be confidential, not me, Your Honor. Well, why don't we hear, Your Honor, the argument about the legal issues of the case? Because we do know the facts of AMAR. Okay. I've seen these pictures, and they're not as clear as this one, but they're not. Okay, I appreciate that, Your Honor. The term pinch resistant is not ambiguous as a matter of law as determined by the district court. Is pinch resistant the only terminology that you're objecting to, or are you objecting to some of these other statements, such as whether fingers can't get in or whatever it is? Those are all a part of the mosaic that gives the meaning to pinch resistant. I don't understand what that means. Are you complaining about these other statements or not? We are complaining about those other statements, but the term of interest, and the term that's recognized by the industry, is pinch resistant. And the law, as I understand it, says you look to the entirety of the advertising to see what the term means. So you're not separately complaining about these other terms? I'm not separately complaining about those other terms, but those other terms should fall by the wayside, because fingers do get in. Those other terms about whether fingers were discontinued and not used after 2002, right? Well, other similar terms, where these pictures of little children by the doors have been used, little things, little fingers, those types of terms have been used. They've been continuously used. You're not answering my question. My question is we've got the term pinch resistant, which stopped being used in 2007, and that's not barred by latches. But we've got the various other statements, which could be seen as being literally false. And the contention is, well, to the extent that you have a cause of action for damages with respect to those, it's barred by latches because they weren't used within two years of the filing. And what I'm asking you is do you dispute that? Our focus in this case is on pinch resistant. To the extent there would be any latches, the latches would only go to damages. The latches would not go to an injunction. But you're not answering my question. Are these other statements, other than pinch resistant, do you agree that the cause of action for damages with respect to those statements is barred by latches? For damages would be barred by latches if we were seeking recovery for those terms separately. We are seeking the term that You're not arguing with respect to those other terms, that there wasn't an entitlement to any injunction? We are not here arguing that, no, Your Honor. What we are arguing is that they have called their doors pinch resistant. They got Lowe's, one of the largest big box retailers in the country, to adopt that terminology, that advertising mosaic, all those tag lines that give definition to pinch resistant for a door that isn't pinch resistant, no matter what kind of definition you want to give the word. Nobody could rationally say that a door that an adult can stick their fingers through the joint in is pinch resistant. The district court got cited There's some undisputed evidence that these doors were less likely to pinch than earlier. So in that sense, they were pinch resistant. But you don't find that anywhere in the advertising. You look to the advertising as a whole. Is my statement accurate that there was undisputed evidence that these doors were less likely to pinch than the earlier versions? They may be less likely to pinch. They're more dangerous when you call them pinch resistant and they can sever your finger. That's the problem. The problem is you're advertising doors as pinch resistant, child safe, little fingers, neither weathering or fingers can get in, all of which goes with the logo of pinch resistant, showing fingers safely adjacent a panel intersection, when in fact that isn't what the door is at all. But counsel, now you're arguing something different than what you argue to the district court. Because to the district court, you argue pinch resistant means DASMO 116. And you try in your motion for reconsideration to say, well, no matter what you call pinch resistant, these doors ain't it, which is what you're arguing to us, which is not a bad argument. But it's not the one that you repeatedly made to the district court and he chastised you in his order with regard to your motion to reconsideration on this exact point at page A27 of the appendix and said, you can't now come in and try and withdraw your definition of pinch resistant from being anything other than DASMO 116. I won't hear you decide this argument. You waived it. But now this is the entire bulk of what you're arguing to us on appeal. The district court held in the motion for reconsideration you waived something. You don't get to bring it to us on appeal. You might bring it to us and say I didn't waive it. But you can't just present it to us as though the district court didn't make this determination. First of all, those arguments were presented in the preliminary injunction motions. Those matters were addressed in the preliminary injunction motions. Those arguments were made in the preliminary injunction motions, which this court combined with these. This court wasn't surprised by those arguments. That's A. B, we're here de novo on these issues. And C, if you were to- No, no, no, counsel, counsel. De novo doesn't mean you get to make up whole new lines of argument on appeal. Let me read to you what the district court said in his motion, his order related to your motion for reconsideration. Wayne Dalton repeatedly argued that a trier of fact would discern that Amar's doors were not pitch resistant because they failed to comply with DASMA 116. It now argues that it can remedy the ambiguity in the term pitch resistant by withdrawing the only definition it offered for the phrase, such after the fact arguments are not appropriate for a motion for reconsideration. And he goes on to explain in further detail. So those are the very arguments you're making now. So I'm not sure what to do with them. Because DASMA 116- First of all, this ambiguity of DASMA 116 was a contrived argument. DASMA 116 was developed to test doors with a 9mm probe which replicates a human finger, replicate a human finger and say it can't get into the joint. This gets into the joint. It's the same argument. It's just a different wrapper. And the reason we went down the DASMA 116 route was- Are you giving up on DASMA 116? No, we're not, Your Honor. We think a jury should have been entitled to determine whether or not DASMA 116 was clear or ambiguous. You think a door like that passes an industry standard for- That's ambiguity. It's a question of law. Ambiguity under the regional circuit law is a question of law. So a jury doesn't necessarily get to decide that. But no, it has to be too ambiguous to be incapable. Not just ambiguous. Too ambiguous to be incapable of a determination of truth or false. And to say that this door is pinch-resistant, do you think any reasonable jury would say this is a pinch-resistant door? That using the term pinch-resistant with that door is proper? Do you think that they would think- He said that you, who have the burden, did not show that these doors unambiguously- that the word pinch-resistant unambiguously meant DASMA 116. No, no. The district court said DASMA 116 was ambiguous. And then said- No, I don't understand them saying DASMA 116 is ambiguous. I understand them saying the use of the word pinch-resistant is ambiguous as to whether it means DASMA 116 or not. No, well, I believe that the evidence that was presented was Amar says, oh, we didn't understand DASMA 116. Although the president of Amar was the president of DASMA at the time it was developed. Something that the jury, the finder of fact, never got to hear. And then they come in and say, oh yeah, we're pinch-resistant. And then they fall behind. I don't understand what you're saying. In terms of literal falsely, pinch-resistant, what the district court says, is an ambiguous term. And on the face of it, it does seem to be somewhat ambiguous. And you didn't present any evidence that consumers were actually misled, which is your burden under the alternative misleading theory. Lowe's was certainly misled. Lowe's bought these doors and sold hundreds of thousands of them using the term. How was Lowe's misled? Because in the presentation to Lowe's, the number one... You're marking something as confidential. Okay, then the number one differentiation for Lowe's, what Amar told Lowe's is you buy these pinch-resistant doors and it'll give you a leg out on Home Depot that doesn't have pinch-resistant doors. How is that a sign that they were misled? Because they then bought into it and they advertised them as pinch-resistant. They developed the same type of logo. This is Lowe's logo. This is Amar's logo. Suppose I reject that. Suppose I disagree with you about that, that Lowe's was misled. There was no evidence here that the ultimate consumers were misled, right? That any individual consumer or homeowner was misled. That's correct. All right, so you've got a problem. On the face of it, it seems to be an ambiguous statement, so it's not literally false. On the other hand, putting aside your argument that it's called Lowe's, there isn't any evidence that any consumer was misled. But if you... I think it defies belief to me that anyone would say that that door is pinch-resistant. And that that is not literally... We've heard that. We've heard this now. And that's not... If you repeat it all the time, we'll give you back your remote time. I do appreciate that. That's right. Good morning. May it please the Court. To the extent that you're responsible for the marketing of this stuff at Confidential, I think that that was not appropriate. A lot of this material that's marked Confidential has no basis for being marked Confidential. Your Honor, the only exhibit that was presented by either party that we marked Confidential was the presentation, the PowerPoint presentation that Amar made to Lowe's because of the competitively sensitive business information in that presentation. All the deposition testimony, the photographs, the e-mails between Wayne Dalton and Lowe's and internal to Wayne Dalton were not marked Confidential by Amar. And we're happy to share them with the Court or anybody else. That said, I respectfully submit that Judge Leoy's rulings should be affirmed for at least three separate reasons. The first reason is the balanced dynamics rule in which the Sixth Circuit clearly held that statements seeking to recover marketplace damages under a literal falsity case cannot recover such damages without also presenting proof of consumer confusion and damages causation. The second reason, notwithstanding the balanced dynamics rule, is Wayne Dalton couldn't prove literal falsity under either of its pinch-resistant, or excuse me, either of its literal falsity theories. The first one clearly was that pinch-resistant meant damage in 116. Wayne Dalton couldn't prove that literal falsity under that theory or under its alternative theory because in podiatric physicians, the Sixth Circuit said that a statement as ambiguous or subject to multiple interpretations cannot be literally false. Some of these statements, put aside pinch-resistant problems, some of the statements seem to be susceptible of finding literal falsity by a juror, such as neither fingers nor rubber fits in. But I take it that as to those, you're not arguing that those are not susceptible of finding literal falsity. Well, Your Honor, as Your Honor pointed out, those statements haven't been used in years. Do you agree with me that those are susceptible of being found to be literally false? I don't think they are on the evidence of this case because we don't have any evidence from consumers as to what they believe these statements are. Well, Your Honor, I guess we have a disagreement of opinion. I don't think they're capable of literal falsity on the evidence of the rest of this case. I'm assuming you're right about that. Assuming you are right about that, it doesn't matter, nevertheless, because Wayne Dalton has not argued literal falsity as to those statements. His theory was that pinch-resistant equals DASDA 116, and that pinch-resistant is otherwise ambiguous, not this other myriad of statements which haven't been used in years. Starting with the balance dynamics rule, Your Honor, balance dynamics is the most recent precedent from the Sixth Circuit as to what it takes to recover marketplace damages in a literal falsity case. Wayne Dalton ignored balance dynamics in its entirety and hinged its case on a single sentence from podiatric physicians, which was decided by the Sixth Circuit a year earlier than balance. The sentence they relied upon was, quote, where statements are literally false, a false advertising violation may be established without evidence that the statements actually misled consumers. However, in podiatry, the court held that the statements in question were ambiguous or subject to multiple interpretations, much like this case, and therefore granted summary judgment of no damages and found that the statements could not be literally false. So they never analyzed in any detail what type of proof a plaintiff has to present in a literal falsity case to recover marketplace damages. The balance court addressed that issue in detail a year later, and in that case the defendant, in fact, did make literally false statements, not about its own product, but about the plaintiff's product. And the court reiterated this isolated sentence from podiatry, but then found that the plaintiff, without proof of confusion or damages causation, still could not recover marketplace damages. And in so doing, made a big distinction between damage control expenses, which don't require such proof, and marketplace damages, which do. Quote from page 691 of the balance opinion, Actual confusion is a prerequisite to an award of such marketplace damages, because actual confusion tends to show that these hard-to-prove damages probably exist. Moving forward to page 693 through 694 of that opinion, the court made it even clearer. The above cases, which included podiatry, demonstrate that literal falsity, without norm, is insufficient to support an award of money damages to compensate for marketplace injuries such as harm to goodwill. A contrary rule would risk conferring an undue windfall on balance dynamics. Balance dynamics presented no evidence that its goodwill was harmed, or that customers were actually deceived by its advertising. The court also stated that balance dynamics admitted that no customers had ever informed it that it was losing a sale due to false statements in question. Those are the exact facts that were present here, except here, Amor's advertisements were not literally false. In this case, Wayne Dalton sought more than $20 million in damages claiming that every sale Amor made of a pinch-resistant door was due to the advertisements, and that Wayne Dalton would have made that sale if Amor had not advertised its doors as pinch-resistant, notwithstanding the fact that there were other competitors in the industry. But despite making that broad claim, Wayne Dalton did not get a market survey, had no consumer research whatsoever done in the case, did not get testimony from a single customer that the customer was deceived by Amor's use of the term pinch-resistant, that Amor's use of the term pinch-resistant was material to the purchaser's decision in any respect, that any consumer bought an Amor door instead of a Wayne Dalton door because of Amor's use of the term pinch-resistant. Moreover, Wayne Dalton admitted that it knew of no instances of confusion, and there was no evidence showing that Lowe's or anybody else ever told Wayne Dalton that it was losing sales due to Amor's use of the term. In contrast to that, and as Judge Leoy pointed out, there was overwhelming evidence in the record that showed that Wayne Dalton lost the business in question, which really was Lowe's, because of Wayne Dalton's poor service, Amor's superior Type II installation capabilities, and the fact that Lowe's had new management that was in place and simply wanted to make a change. Wayne Dalton's CEO testified that Lowe's chose Amor because of its superior Type II installation capabilities. Wayne Dalton's president said that the change was because Lowe's had a new management team in place that simply wanted to make a change to get the comps up. He said nothing about pinch-resistance. Wayne Dalton's retail sales director, the guy that had constant contact with Lowe's, said he didn't know the real reason. He said it could have something to do with customer service, but to get to the truth, you have to ask Lowe's. That's what he said. Wayne Dalton made the conscious decision not to ask Lowe's that question, at least on the record, because Wayne Dalton knew what the answer would be. Less than a month before Wayne Dalton filed this lawsuit, its retail sales director sent an email confirming the decision had nothing to do with pinch-resistance. He stated, quote, It's obvious that Lowe's could care less about differentiation of product. They cannot sell pinch-resistance or free phone stock. We must begin to think based on what Lowe's is doing or the direction they are headed versus where we have been. The record is replete with evidence and emails like this, internal to Wayne Dalton or between Wayne Dalton and Lowe's, showing the decision had nothing to do with pinch-resistance. None of those emails referenced pinch-resistance. They all talked about problems Lowe's was having with Wayne Dalton's customer service and the fact that Amar was bringing in superior installation capabilities with a Type II installation program. And incidentally, in their reply brief, they argued for the first time that those emails are inadmissible and can't support summary judgment based on the hearsay rule. Most of the emails are internal to Wayne Dalton himself, so obviously those are statements by part of the opponent. But regardless, they never made that argument, although they can't make a new argument to your honors. As judge of the only corrective found, such evidence transforms what is in isolation a very weak inference of a tendency to deceive supported by highly circumstantial evidence into a wholly unreasonable one. The Balanced Dynamics Court noted that they, through its research, had only found one case that granted marketplace damages based on literal falsity alone. And they said that was a special circumstance, that was a PPX case that involved a palming-off situation. Clearly, this is not a palming-off case. None of the cases that Wayne Dalton has cited to your honors stand for the proposition that the plaintiff can just rely on literal falsity alone without proof of confusion or damages causation and recover marketplace damages. And I urge your honors to read those cases that Wayne Dalton cited for that proposition because they don't stand for that proposition. Specifically, the international technologies case that they cited, which makes the exact same distinction that the Balanced Court made between damage control expenses and marketplace damages. The court there said, plaintiff seeks injunctive relief in recovery of damage control expenses. Such remedies are available upon a lesser showing of a tendency to deceive. So, in conclusion on the first point, Wayne Dalton couldn't recover damages under the Balanced Dynamics Rule, which is controlling the precedent for the Sixth Circuit. Second, even if this court were to reject the Balanced Dynamics Rule, Wayne Dalton couldn't prove literal falsity under either of his theories, in my opinion. Now, the starting point here is what can constitute a literally false ad and what cannot constitute a literally false ad. In podiatry, the Sixth Circuit found a term professionally recognized in several other terms were ambiguous or subject to multiple interpretations and consequently could not be literally false. And other circuits are consistent with that rule. We cited Scott's case from the Fourth Circuit, another case as far as Seah Corp at 292 F sub 2nd 594. That's a district in New Jersey case. It said, quote, only an unambiguous message can be literally false. If the message is susceptible of more than one being, the plaintiff cannot assert literal falsity. With that background, it's clear that Wayne Dalton's true literal falsity theory was that pinch-resistant means DASMA 116 compliant. Wayne Dalton's complaint made the contention. Wayne Dalton's prayer for relief only requested that AMR be enjoined from advertising that its doors comply with DASMA 116. Wayne Dalton's preliminary injunction papers repeatedly contended that pinch-resistant meant DASMA 116. Wayne Dalton's expert report, which was submitted to us after discovery closed, so we didn't have any opportunity to pursue these other theories they came up with after discovery closed, provided no alternate definitions. The report concluded, the door products of that exam were not compliant with the standard and therefore are not pinch-resistant. Wayne Dalton's brief in support of summary judgment of literal falsity, submitted again after discovery closed, the definition presented there, DASMA 116 sets out the standard for a pinch-resistant garage door, end quote. Judge Leoy did not erroneously conclude that that was their literal falsity theory, and they could not prove literal falsity under that theory. First, there was no evidence from any consumers that they believed that pinch-resistant meant DASMA 116 compliant. Wayne Dalton's CEO and its expert both admitted that customers don't know anything or little if anything about the standard DASMA 116. DASMA is a manufacturer's organization, not a consumer's organization. Wayne Dalton, Amar, and other companies started using the term well before DASMA 116 was even adopted in June of 2000. The only evidence from consumers came from garage door dealer declarations that Amar submitted to the court, showing that consumers believe the term stands for, quote, a door that's safer than traditional door in terms of reducing the risk of serious pain or finger injuries. Second, while the case was pending, and as a result of comments that Wayne Dalton's own expert made to DASMA, DASMA realized that the standard itself was ambiguous, and the ambiguities that they found pertained to the exact differences between Wayne Dalton's and Amar's interpretation of that standard. Mr. Skates raised questions, and DASMA, who are the experts on the standards, formed a subcommittee to review the issues. And they agreed with Mr. Skates that the standard was ambiguous, and so they revised the standard. And after discovery had closed in January of 2008, they issued a new revised standard, DASMA 116. So there's absolutely no way that Wayne Dalton can prove literal falsity under that theory. So if you allow Wayne Dalton to move to a second theory, belatedly, I don't think they can prove literal falsity there either. And the big problem there is that in this case alone, no less than seven definitions of pinch resistance have been presented to the court, including this court, at least five of which came from Wayne Dalton. In Wayne Dalton's original appellant brief, page 32, note 41, Wayne Dalton defined the term as, quote, the term has always meant that fingers cannot be placed into a joint between the door panels such that they can be pinched. In other words, Wayne Dalton was arguing pinch proof. When this court required Wayne Dalton to resubmit its opening brief because it had exceeded the word count, and Wayne Dalton had the opportunity to review our response brief taking issue with that definition, Wayne Dalton deleted it from its new opening brief and only argued in its new opening brief that the term meant, quote, resistant to pinching. So that's two definitions. In the appellant briefs alone. Wayne Dalton's website had two different definitions. One page of its website said the shape of the contact point between the two door panel sections is designed to push fingers away as the door closes, helping prevent fingers from getting caught in the door joint. So that suggests that maybe fingers can get in, but once they get in, when the door is closing, which is what happens with these doors, the objects get pushed out. These pictures don't show the door closing. Another page from Wayne Dalton's website defined the term as a design that, quote, helps prevent homeowners from accidentally getting fingers caught between the sections of the closing door. Not intentionally, but accidentally. So that's four definitions from Wayne Dalton alone. The fifth definition, pinch resistant means DASNY 116. There are two others. I see I'm out of time. No, you have an extra five minutes if you want. Again, the only evidence from consumers was that the term refers to a door that's safer than a traditional door in terms of reducing serious injuries. That's six definitions. And the seventh is a DASNY technical data sheet posted on its website that defined the term as a, quote, term for a door that has been designed to prevent entrapping, crushing, breaking, severing, or dislocating a person's finger. That's seven definitions. Under podiatry, a term that is ambiguous or subject to multiple interpretations cannot be literally false. So even if this court allows Wayne Dalton to move past its original literal falsity theory, it loses on its new theory. Third, I think Wayne Dalton's claim is barred by lapses as well. The judge literally got it right on that count. Amar started using the term pinch resistant in 1999. Wayne Dalton waited more than seven years to complain about Amar's use of that term until after it lost the Lowe's line review to Amar. Wayne Dalton created a press release posted it on its website, took a copy of the press release to a meeting with Lowe's after line review in an attempt to get Lowe's to change its mind, to not go with Amar. Only after Lowe's refused the request did Wayne Dalton serve its complaint on Amar in this case. That's seven years later. In an attempt to avoid the presumption that lapses applies, Wayne Dalton came up with a falling out of compliance theory pursuant to which they say, well, at some point, Amar's doors fell out of compliance we think around August of 2005 with DASMA 116. I ask you, how consistent is that new theory with Wayne Dalton's contention now that pinch resistant doesn't mean DASMA 116? You can't reconcile the two. But in any event, what Wayne Dalton is basically saying is Amar has to admit liability in the first instance in order to pursue the lapses defense in the second. I'm aware of no cases that adopt that type of a test. Regardless, Wayne Dalton's falling out of compliance theory doesn't withstand scrutiny. First, Wayne Dalton is claiming damages back to 2004 long before they say Amar's doors allegedly fell out of compliance. How can they say we fell out of compliance in 2005 and claim damage from 2004? Second, Wayne Dalton continues to rely on ads that predate 2005 and weren't running any time close to 2005. Some of the ads that Mr. Weber brought to court today were last run in 2002. He hasn't put them up on the easel yet, but appendix 3172 and 3173, which he submitted as potential blow-ups, were both last run prior to 2003. Wayne Dalton's opening brief, page 11, footnote 6, cites many advertisements that were last run long before 2005. Amar last used the terms exceeds industry standards inspired by little things, little hands, and neither finger nor weather gets in in March of 2002. No later than March of 2002. The standard is that the period of delay begins to run when Wayne Dalton had actual or constructed knowledge of the alleged infringing activity. If Wayne Dalton claims that these advertisements were allegedly false, it had a duty to investigate until he explained back then when they were run, not four years later. In conclusion, Judge Midway presided over this case for well over a year. She reviewed more than at least 12 briefs that were supported by volumes of deposition testimony, affidavits, and exhibits submitted by the party on the false advertising issues. And after reviewing that evidence, she concluded correctly that Wayne Dalton was not not entitled to monetary damages or injunctive leave. I respectfully submit that Judge Midway got it right and this panel should affirm her decisions in all respects. Thank you. It's difficult to imagine how you can have the latches, which is a two year period, without having a starting date for that two year period. We tested a door, a door early on in 1999 and 2000 and found that it indeed passed ASMA 116. We tested another one in August of 2005, less than a year before we filed our lawsuit and found that it did not. Through discovery, we found out in that same time frame AMAR redesigned their doors because they couldn't hold the close tolerance that was necessary at the panel interfaces to make a truly pinch-resistant door. Pinch-resistant was used within two years of filing the suit, so latches doesn't apply to the pinch-resistant advertising, right? Pinch-resistant? I can still go to Lowe's stores today. Yes, right? No, they haven't quit using pinch-resistant. I was asking... Oh, I apologize. I thought you said they had. But as to the other advertising that could be seen as all discontinued more than two years before, right? The other advertising was. I don't know that I agree with you that it was separately actionable. We're looking at one group of advertising and we did address the totality of the advertisements in our brief. I mean, in our briefing. We addressed that. And the law, I believe, is clear that you look at the mosaic of the advertising to figure out what the words facially convey. If you want to know what pinch-resistant means, look at the totality of the advertisement. Neither fingers nor weather gets in. Little things. Little hands. Things of that nature tells you in spades what pinch-resistant means. But the mosaic didn't continue. Oh, the mosaic continues today, Your Honor. They're not using these other terms. They're using different terms. Well, no, because they still use the word pinch-resistant. I can go to Lowe's stores. You can probably go to a Lowe's store right here in this area and pick up literature. I did it in my own hometown. Picked up literature that says pinch-resistant. That's the term the industry uses. They're playing games trying to sell dangerous doors, and these are dangerous doors. Selling dangerous doors that any juror would look at and say that can't be a pinch-resistant door, and play games with the terminology and the wording. Now they use the term designed to be safe, or designed to prevent serious hand injuries. Well, their design failed. You know what? Designed to do it? Maybe that's true. But it failed in the manufacture of it. And that's the problem they ran into in 2005. They couldn't hold the close tolerance. They redesigned their doors. They had to open up that gap because they were getting rubbing and binding as the doors were articulating, and when they did that, they fell way out of being anywhere near a pinch-resistant door, or a safe door, or a door that's safer than prior doors. They don't have any of that, but what do they do? They tell the public they do. And Lowe's was the intended audience. And that's what you'll look at. The law says who was the intended audience for the ads? The presentation, the Lowe's presentation, the intended audience was obviously Lowe's. And was Lowe's deceived? You bet your life they were deceived. They adopted a similar logo and similar storyline and pattern for those dangerous doors. The public is greatly disserved by someone who's allowed to go out and advertise and promote a door like that and call it pinch-resistant. If the court wanted to know, if the trial court wanted to know what did Dasman have in mind, you just read Dasman. It says the purpose of  to prevent serious injuries to fingers and to preclude or prevent the entry of fingers into these door panel joints. Do you think that no matter what definition you give it would satisfy Dasman 116? A jury should have at least been allowed to look at Dasman 116 and say, is the way Amar is applying this, does that make any sense at all? Or is that just a contrived thing to be able to say oh, we thought we were complying with Dasman 116. They worked on the committee that developed Dasman 116. They knew the purpose was to prevent this type of door and to suggest that they believed that their tests were proven. I appreciate you. Thank you.